UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

GREGORY SHINER,                  :
                                 :
           Plaintiff             :    No. 3:12-CV-01683
                                 :
      vs.                        :    (Judge Kosik)
                                 :
CAROLYN W. COLVIN, ACTING        :
COMMISSIONER OF SOCIAL           :          **FILED**
SECURITY,                        :       **SCRANTON**
                                 :
           Defendant             :       MAY - 2 2014

                    MEMORANDUM          PER ——— DEPUTY CLERK

**Background**

          The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Gregory Shiner's claim for social security

disability insurance benefits.

          Shiner protectively filed[1] his application for

disability insurance benefits on March 23, 2009. Tr. 12, 77, 100-

107 and 123.[2]  The application was initially denied by the Bureau

of Disability Determination on July 29, 2009.[3]  Tr.79-83.

_____

1.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2.  References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of the Answer on November
2, 2012.

3.  The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security
                                              (continued...)

On August 7, 2009, Shiner requested a hearing before an administrative law judge. Tr. 84-85.   After about 13 months had passed, a hearing was held before an administrative law judge on September 14, 2010. Tr. 40-76.   On October 21, 2010, the administrative law judge issued a decision denying Shiner's application. Tr. 12-22.   As will be explained in more detail, *infra.,* the administrative law judge found that Shiner failed to prove that he met the requirements of a listed impairment or suffered from work-preclusive functional limitations. Id. Instead, Shiner had the ability to perform a limited range of sedentary to light work,[4] including as a ticket taker. Tr. 21.

---

3.   (...continued)
Administration.   Tr. 80.

4.   The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.   Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.   Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.*   Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.   To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or
>                                               (continued...)

On November 12, 2010, Shiner filed a request for review with the
Appeals Council and on July 16, 2012, the Appeals Council
concluded that there was no basis upon which to grant Shiner's
request for review. Tr. 1-8 and 190-191.   Thus, the
administrative law judge's decision stood as the final decision
of the Commissioner.

Shiner then filed a complaint in this court on August
23, 2012.   Supporting and opposing briefs were submitted and the
appeal[5] became ripe for disposition on March 21, 2013, when
Shiner elected not to file a reply brief.

Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.

---

4.   (...continued)
        she can also do sedentary work, unless there are
        additional limiting factors such as loss of fine
        dexterity or inability to sit for long periods of time.

        (c) *Medium work*.  Medium work involves lifting no more
        than 50 pounds at a time with frequent lifting or
        carrying of objects weighing up to 25 pounds.   If
        someone can do medium work, we determine that he or she
        can do sedentary and light work.

        (d) *Heavy work*.  Heavy work involves lifting no more
        than 100 pounds at a time with frequent lifting or
        carrying of objects weighing up to 50 pounds. If
        someone can do heavy work, we determine that he or she
        can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

5.   Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."   M.D.Pa. Local Rule 83.40.1.

The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Shiner met the insured status requirements of the Social Security Act through June 30, 2013. Tr. 12, 14, 107 and 154.

Shiner, who was born in the United States on December 11, 1959, graduated from high school in 1978 and can read, write, speak and understand the English language. Tr. 140 and 269. During his elementary and middle school education, Shiner attended regular education classes and during high school he attended college preparatory classes and received average to above average grades. Tr. 151 and 269. In the mid-1990s while working as a paste-up artist for The Charlotte Observer, Shiner pursued an Associates degree in printing at Central Piedmont Community College (CPCC) located in Charlotte, North Carolina. Tr. 124 and 269. Shiner did not graduate from CPCC but stopped 16 credits short of obtaining a degree. Id.

Shiner's work history covers more than 31 years and at least 18 different employers. Tr. 108-119. The records of the Social Security Administration reveal that Shiner had earnings in the years 1978 through 2008. Tr. 108. Shiner's annual earnings range from a low of $999.93 in 1979 to a high of $37,309.82 in 2002. Id. Shiner's total earnings during those 31 years were $468,095.57. Id.

4

Shiner has past relevant employment[6] as (1) a
convenience store manager which was described by a vocational
expert as skilled, light work as usually performed in the
economy, but medium work as actually performed by Shiner; (2) a
costing manager at a manufacturing plant, which was described as
semi-skilled, light work as normally performed in the economy,
but heavy work as actually performed by Shiner;[7] (3) a door-to-
door sales representative for a cable company, which was
described as unskilled, light work; (4) a sales associate for a
hardware store  and a paint store, both of which were described
as semiskilled, medium work positions; and (5) a paste-up artist
for a newspaper, which was described as unskilled, light work.
Tr. 68 and 124-134.

Shiner claims that he became disabled and unable to
engage in competitive full-time work on December 14, 2008,
because of both physical and mental disorders. Tr. 100 and 140-
141. In the brief submitted in support of the present appeal,
Shiner stated that the disabling disorders were "a right
paracentral disc herniation at the C5-C6 level with right sided

_____

6.   Past relevant employment in the present case means work
performed by Shiner during the 15 years prior to the date his
claim for disability was adjudicated by the Commissioner.   20
C.F.R. §§ 404.1560 and 404.1565.

7.   Shiner reported that he "calculated cost to manufacture lace
goods" and that sometimes when he did not have anything to do he
would "carry beams of yarn to machines" which weighed 80 pounds
or more. Tr. 126-127.

spinal canal stenosis, degenerative disc disease,[8] post-

concussion syndrome[9] and major depressive disorder." Doc. 10,

Plaintiff's Brief, p. 2. The impetus for Shiner's disabling

---

8.   The spine consists of several elements including vertebral
bodies and intervertebral discs. The intervertebral discs (made
of cartilage) are the cushions (shock absorbers) between the bony
vertebral bodies that make up the spinal column. Each disc is
made of a tough outer layer and an inner core composed of a
gelatin-like substance.
     Degenerative disc disease is the wear and tear and breakdown
of the intervertebral discs as a person grows older.  It is a
process that can result from the dehydration of the discs, as
well as an injury to the spine. The breakdown of the
intervertebral discs can result in discs bulging, protruding or
herniating, as well as the inner gelatin-like core of the disc
extruding outside the outer layer. These conditions sometimes
obstruct the openings (foramen) along the spine through which
nerve roots exit. This condition is known as neural foraminal
narrowing or stenosis. They can also result in a narrowing of the
spinal canal or spinal stenosis. Such bulges, protrusions and
herniations, if they contact nerve tissue, can cause pain.
     Degenerative joint disease (or osteoarthritis) is a
breakdown of the cartilage between joints.  In the spine, there
are facet joints which are in the back of the spine and act like
hinges. There are two superior (top) and two inferior (bottom)
portions to each facet joint called the superior and inferior
articular processes. These joints are covered with cartilage and
the wear and tear of these joint is known as facet arthropathy
(arthritis). This wear and tear of the facet joints result in
loss of cartilage and can cause pain.

9.   "Post-concussion syndrome is a complex disorder in which a
variable combination of post-concussion symptoms - such as
headaches and dizziness - last for weeks and sometimes months
after the injury that caused the concussion.
     Concussion is a mild traumatic brain injury, usually
occurring after a blow to the head.  Loss of consciousness isn't
required for a diagnosis of concussion or post-concussion
syndrome. In fact, the risk of post-concussion syndrome doesn't
appear to be associated with the severity of the initial injury.
     In most people, post-concussion syndrome symptoms occur
within the first seven to 10 days and go away within three
months, though they can persist for a year or more." Diseases and
Conditions, Post-concussion syndrome, Mayo Clinic staff,
http://www.mayoclinic.org/diseases-conditions/post-concussion-syn
drome/basics/definition/CON-20032705 (Last accessed April 29,
2014).

disorders was a motor vehicle accident which occurred on December 14, 2008. Tr. 701.  On that date, Shiner contends that while stopped at a red light, he was rear-ended by another vehicle. Id. Shiner claims that he has chronic headaches, neck stiffness and pain, mid and low back pain, spasms in his mid-back, shooting pain down the backs of his legs, right hand numbness, weakness in and lack of control of his hands, difficulty holding a pen and using a keyboard, difficulty sitting or standing for any length of time, balance issues, numb feet, blurry vision, lack of focus, poor short term memory, problems counting, trouble communicating, and depression. Tr. 50-59, 63-67 and 140.

Although Shiner testified at the administrative hearing that he had difficulty with counting numbers, he submitted a document to the Social Security Administration on May 16, 2009, in which he stated that he could pay bills, count change, handle a savings account and use a checkbook and money orders. Tr. 74 and 161. That document which was completed by Shiner was handwritten, 8-pages in length and legible.[10] Tr 158-165.

At the administrative hearing on September 14, 2010, Shiner testified that he was working part-time, 20 hours per week as a license photo technician for the Pennsylvania Department of

---

10.  A review of the record reveals that Shiner also prepared several typewritten documents, as well as at least two other handwritten document, after his alleged disability onset date of December 14, 2008. Tr. 166-167, 170, 508-509 and 859.

Motor Vehicles, which position was described by a vocational expert as unskilled, sedentary work.[11] Tr. 53-55 and 68.

For the reasons set forth below, we will affirm the decision of the Commissioner denying Shiner's application for disability insurance benefits.

## Standard of Review

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter

---

11. The record does not reveal when Shiner commenced this part-time employment. However, a psychiatric evaluation dated February 9, 2010, indicates that Shiner was unemployed. Tr. 858. The administrative law judge found that the position was a non-competitive job, Shiner received $7.35 per hour, and his biweekly take home pay was $240 which did not amount to substantial gainful activity under the regulations of the Social Security Administration. Tr. 14.

v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence, but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B.,

9

340 U.S. 474, 488 (1971).  A single piece of evidence is not

substantial evidence if the Commissioner ignores countervailing

evidence or fails to resolve a conflict created by the evidence.

Mason, 994 F.2d at 1064.  The Commissioner must indicate which

evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203;

Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the

decision of the Commissioner must scrutinize the record as a

whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981);

Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must

demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in

significant
> numbers either in the region where such individual
> lives or in several regions of the country.

10

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[12] (2) has an impairment that is severe or a combination of impairments that is severe,[13] (3) has an impairment or combination of impairments that meets or equals the requirements

---

12.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

13.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).  An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

11

of a listed impairment,[14] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[15]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

14.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listin‚g an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

15.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**Discussion**

The administrative law judge at step one of the sequential evaluation process found that Shiner had not engaged in substantial gainful work activity since December 14, 2008, the alleged disability onset date. Tr. 14. The administrative law judge stated that Shiner had engaged in work activity after the alleged onset date, but that the work activity did not rise to the level of substantial gainful activity in light of the limited earnings received. Id.

At step two of the sequential evaluation process, the administrative law judge found that Shiner had the following severe impairments: "a small right paracentral disc herniation at the C5-6 level resulting in mild right sided spinal canal stenosis, degenerative disc disease, post concussive syndrome and major depressive disorder[.]" Id.

At step three of the sequential evaluation process the administrative law judge found that Shiner's impairments did not individually, or in combination, meet or equal a listed impairment. Tr. 15.

At step four of the sequential evaluation process, the administrative law judge found that Shiner had the ability to perform a limited range of sedentary to light work. Tr. 15. Specifically, the administrative law judge asked the vocational expert to consider an individual with Shiner's education and work background and who could perform both sedentary and light work with a self-directed sit/stand option which did not involve

13

constant or repetitive overhead reaching or frequent or constant
bending below the waist, or more than occasional operation of
foot controls or more than occasional ascending of ramps or
stairs, etc.; the administrative law judge additionally limited
the individual to work that was not of a complex or highly
skilled nature and was not multi-tiered or multi-step work, but
rather work that was simple, routine and repetitive involving
minimal oral communication with the public and co-workers and
work which did not involve the computations of change or the
like. Id.

In setting the residual functional capacity, the
administrative law judge found that Shiner's statements
concerning the intensity, persistence and limiting effects of his
impairments were not credible to the extent that they were
inconsistent with his ability to engage in the work as described
above. Tr. 20. The administrative law judge also, although giving
Shiner the benefit of the doubt, relied on the opinion of a state
agency physician and a state agency psychologist, who opined that
Shiner did not have any severe physical or psychological
impairments, respectively. Tr. 19 and 453-466.

Based on the above residual functional capacity and the
testimony of a vocational expert, the administrative law judge
found that Shiner could not perform his prior relevant work, but
that he had the ability to perform work as a ticket taker,
information clerk, and light assembler, and that there were a

14

significant number of such jobs in the state and national economies. Tr. 21-22, 71-72 and 74-75.

The administrative record in this case is 859 pages in length, primarily consisting of medical and vocational records. Shiner generally argues that the administrative law judge's decision is not supported by substantial evidence. He takes issue with the ALJ's residual functional capacity assessment based on the testimony that he gave at the administrative hearing. He contends that the ALJ should have accepted his testimony. He further contends that he could not perform the jobs identified by the vocational expert, because the ticket taker position involved the computation of change and the light assembler and information clerk would not accommodate a sit/stand option. We have thoroughly reviewed the record in this case and find no merit in Shiner's arguments.[16]

The administrative law judge did an adequate job of reviewing Shiner's vocational history and medical records in his decision. Tr. 17-26.  Furthermore, the brief submitted by the Commissioner is a thorough and accurate review of the medical and vocational evidence in this case. Doc. 15, Brief of Defendant.

---

16.  Shiner also alludes to the fact that the vocational expert initially indicated that he could perform the job of a cashier, which requires the computation of change. This is a "red herring" because the ALJ did not find that Shiner could perform that position and it is clear from the transcript that based on that limitation (jobs that did not require the computation of change,) the vocational expert substituted the light assembler position in place of the cashier position. Tr. 74.

Consequently, we will only comment on some of the medical records.

On July 7, 2009, John N. Grutkowski, Ph.D., a psychologist, reviewed Shiner's medical records on behalf of the Bureau of Disability Determination and concluded that Shiner suffered from a cognitive disorder, not otherwise specified, but that it was not a severe impairment. Tr. 453-454. Dr. Grutkowski found that Shiner had mild limitations with respect to activities of daily living, maintaining social, and maintaining concentration, persistence and pace, and no repeated episodes of decompensation of an extended duration. Tr. 463.

On July 24, 2009, Sharon A. Wander, M.D., reviewed Shiner's medical records and reported that those records revealed multiple allegations, little objective medical evidence and unremarkable physical examination findings. Tr. 466. She concluded that Shiner's physical impairments were non-severe. Id.

As stated earlier, the impetus for Shiner's alleged disabling impairments was a motor vehicle accident which occurred on December 14, 2008.[17] After that accident, Shiner was treated at the emergency department of Palmerton Hospital, Palmerton,

---

17. The record reveals inconsistent statements by Shiner regarding the accident, including a statement that at one poin,t he was stopped at a red light when he was rear-ended and also a statement that he was braking at a yellow-light when he looked in his rear view mirror and the vehicle behind him continued forward and hit his vehicle twice. Tr. 269 and 515. On at least one occasion, he told a medical provider that he was rear-ended by another vehicle which was traveling at a speed of 70 miles per hour. Tr. 666.

Pennsylvania. Tr. 197-200, 353-354 and 698-704. A physical
examination of Shiner at the hospital revealed no abnormal
findings, other than a small superficial abrasion on the back of
the head. Tr. 701. Shiner was alert and had painless range of
motion of the neck, normal sensation and normal motor strength.
Id. X-rays of the cervical spine were negative for an acute
fracture and revealed "straightening" of the normal curvature of
the cervical spine "possibly due to positioning or muscle spasm"
and degenerative changes on the right side at the C3-C4 level
possibly compromising the neural foramen. Tr. 199. X-rays of the
lumbar spine revealed mild degenerative changes and a mild
compression fracture of the T12 vertebra of uncertain age but no
acute fracture was discovered. Id. At the time of discharge on
the same day, Shiner denied the "dizzy" and "fuzzy feeling" he
had on arrival; he was alert and oriented to person, place and
time; and he ambulated without difficulty. Tr. 700.  A CT scan of
Shiner's head performed on December 19, 2008, was normal. Tr.
206.

Shiner commenced treatment with Ross B. Buchieri, D.C.,
a chiropractor on December 17, 2008. Tr. 230.  On a medical form
completed by Shiner at the initial evaluation, Shiner reported
that he had every symptom of the 23 symptoms listed on the form
other than chest pain, shortness of breath and blurred vision.
Tr. 253.  An examination by the chiropractor revealed that Shiner
was unable to rotate his head without pain and he exhibited
restricted range of motion of the cervical and lumbar spine. Tr.

232-234. Shiner received regular chiropractic treatment from Dr.
Buchieri from late December, 2008, and into the second week of
April, 2009.[18] Tr. 144 and 228-358.

On January 5, 2009, Shiner had an appointment with
Robert Mauthe, M.D., a physiatrist, at which Shiner reported
multiple complaints, including headaches and neck pain. Tr. 210.
The results of a physical examination were essentially normal,
other than some limited range of motion in the cervical and
lumbar spine and tenderness over the cervical spine. Tr. 211. Dr.
Mauthe advised Shiner that he "[did] not see any obvious
neurologic damage or indication . . . for surgical intervention"
and recommended conservative treatment consisting of physical
therapy. Id.

Shiner underwent a neuropsychological evaluation on
January 20, 2009, at Good Shepherd Rehabilitation Hospital,
located in Allentown, Pennsylvania. Tr. 397-402. The evaluation
revealed that Shiner "functions within the average range of
intelligence in verbal abilities and high average range of
functioning in visual-spatial abilities;" Shiner has "adequate
reading and spelling skills but somewhat lower arithmetic
skills;" he has a mild to moderate level of symptoms associated
with depression; and he has an average memory testing
performance. Tr. 401. The evaluator concluded that Shiner "likely
sustained a mild concussion secondary to the motor vehicle
accident[.]" Id.

---

18. Dr. Buchieri's treatment notes are basically illegible.

18

When examined on March 27, 2009, by Kevin Hsu, M.D., a
pain management specialist, located in Bethlehem, Pennsylvania,
Shiner reported that he smoked 1 pack of cigarettes per day and
denied any psychiatric symptoms. Tr. 221. The results of a
physical examination were essentially normal other than some
muscle and ligament tenderness; a positive straight leg raising
test on the right;[19] mildly decreased sensation to pinprick on
the right at the C6 and C8 level of the cervical spine; and
decreased sensation to pinprick on the left at the L4 and L5
level of the lumbar spine and the S1 level of the sacral spine.
Tr. 221-222. Notably, Shiner walked with a normal, nonantalgic
gait;[20] he had a negative Spurling's test bilaterally;[21] he had
full range of motion of the neck; he had full lumbar spine range

_____

19. The straight leg raise test is done to determine whether a
patient with low back pain has an underlying herniated disc. The
patient, either lying or sitting with the knee straight, has his
or her leg lifted. The test is positive if pain is produced
between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing
for Herniated Discs: Straight Leg Raise, SpineUniverse,
http://www.spineuniverse.com/experts/testing-herniated
-discs-straight-leg-raise (Last accessed April 29, 2014).

20. Antalgic is defined as "counteracting or avoiding pain, as a
posture or gait assumed so as to lessen pain." Dorland's
Illustrated Medical Dictionary, 97 (32nd Ed. 2012).

21. The Spurling's test is an examination to determine whether a
patient suffers from cervical spondylosis or radiculopathy. It
is an "evaluation for cervical nerve root impingement in which
the patient extends the neck and rotates and laterally bends the
head toward the symptomatic side; an axial compression force is
then applied by the examiner through the top of the patient's
head; the test is considered positive when the maneuver elicits
the typical radicular arm pain." MediLexicon, Definition:
"Spurling Test," http://www.medilexicon.com/medicaldictionary
.php?t=90833 (Last accessed April 29, 2014).

of motion; he was able to walk on his heels and toes;[22] he had a
negative Patrick test bilaterally;[23] he had a negative Hoffman's
test bilaterally;[24] he had normal reflexes and muscle tone and
strength in the upper and lower extremities and no muscle
atrophy;[25] he was able to perform rapid bilateral alternating
movements well; his recent and remote memory was intact; he was
attentive and able to concentrate; and his speech was articulate
and fluent. Id. Dr. Hsu ordered, inter alia, an MRI of Shiner's
lumbar spine. Id. Shiner had a follow-up appointment with Dr.
Hsu on April 3, 2009. The results of the physical examination
performed by Dr. Hsu on April 3rd were essentially the same as
those reported on March 27, 2009. Tr. 224-226.

---

22. The heel walk test requires the patient to walk on his
heels. The inability to do so suggests L4-5 nerve root
irritation. The toe walk test requires the patient to walk on his
toes. The inability to do so suggests L5-S1 nerve root
irritation. Clinical Examination Terminology, MLS Group of
Companies, Inc., https://www.mls-ime.com/articles/
GeneralTopics/Clinical%20Examination%20Terminology.html (Last
accessed April 29, 2014).

23. The Faber test or Patrick's test is a pain provocation test
which reveals problems at the hip and sacroiliac regions. Faber
is an acronym which stands for flexion, abduction and external
rotation.

24. The Hoffman's sign is a neurological sign in the hand which
is suggestive of spinal cord compression. The test involves
tapping the nail on the third and fourth finger. "The test is
positive for spinal cord compression when the tip of the index
finger, ring finger, and/or thumb suddenly flex in response."
Hoffman Sign: Red Flag for Cervical Myelopathy,
Orthopod,http://www.eorthopod.com/content/hoffmann-sign-red
-flag-for-cervical-myelopathy (Last accessed April 29, 2014).

25. Atrophy is defined as "a wasting away; a diminution in the
size of a cell, tissue, organ, or part." Dorland's Illustrated
Medical Dictionary, 175 (32nd Ed. 2012).

On April 15, 2009, Shiner had an appointment with Shahzad A. Khan, M.D., a neurologist, located in Palmerton, Pennsylvania.  The results of a physical examination of Shiner performed by Dr. Khan were very similar to those reported by Dr. Hsu. Tr. 410-412. Dr. Khan also reported on Shiner's mental status. Tr. 410.  Dr. Khan stated that Shiner was alert and attentive; Shiner was oriented to person, place and time; Shiner was able to recall the events of his present illness without any difficulty and recall 3 of 3 objects at 1-2 minutes; Shiner had good spontaneous speech and comprehension and his attention span was normal; and Shiner had an appropriate mood and an adequate fund of knowledge. Id.

The MRI of Shiner's lumbar spine which was performed on March 30, 2009, revealed essentially normal vertebrae and intervertebral discs. Tr. 219. The report of the MRI did note "a small, chronic-appearing Schmorl's node[26] involving the superior

---

26.  Schmorl's nodes are upward and downward protrusions of a spinal disk's soft tissue into the bony tissue (vertebral endplates) of an adjacent vertebra. They occur as the spine ages and they may or may not cause symptoms.  Schmorl's nodes do not bulge or herniate toward the spinal cord or to the sides (neural foramen) where the nerve roots exit the spine.  A Schmorl's node is a type of herniation, that is a vertical herniation, but the typical herniation is where the nucleus pulposus, the jelly-like substance in the middle of the spinal disc, protrudes into the outer layer of the disc (annulus fibrosus) and impinges on a nerve root or the spinal cord. See, generally, Schmorl's Nodes & Running, Livestrong.com, http://www.livestrong.com/article /492012-schmorls-nodes-running/ (Last accessed April 29, 2014); Definition of Schmorl's node, MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey =14007 (Last accessed April 29, 2014); Schmorl's nodes, Radiopaedia.org, http://radiopaedia.org/articles/schmorl_nodes. (Last accessed April 29,2014).

endplate of L1." Id. There was no compression fractures, spondylolisthesis or spondylolysis.[27] Id. The physician interpreting the MRI stated in the impression section of the report of the MRI: "Unremarkable MRI of the lumbar spine." Id.

An MRI of Shiner's brain performed on April 20, 2009, was normal. Tr. 423. An MRI of Shiner's thoracic spine also performed on April 20th revealed "minor degenerative changes" and "[n]o evidence for compressive cord or root disease." Tr. 422.

On April 24, 2009, Shiner underwent a nerve conduction study and electromyogram of the upper and lower extremities which was conducted by Dr. Khan. Tr. 487-490. Prior to these electrodiagnostic tests, Dr. Khan examined Shiner's extremities and found that Shiner had intact pin prick sensation, normal muscle strength and good stretch (deep tendon) reflexes. Tr. 487. The results of the nerve conduction study and electromyogram were normal. Id. The tests revealed no evidence "for right carpal tunnel syndrome, ulnar neuropathy across elbow, C5-8 and T1 cervical or bilateral lumbar radiculopathy."[28] Id. On April 30,

27. A vertebra consists of several elements, including the vertebral body (which is the anterior portion of the vertebra), pedicles, laminae and the transverse processes. Spondylolysis is basically a stress fracture or breakdown of the components of a vertebra. See Dorland's Illustrated Medical Dictionary, 1754 (32nd Ed. 2012). A spondylolisthesis is a forward slip of one vertebra relative to another. Id. The endplates are the flat, horizontal surfaces of the vertebral bodies.

28. Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the
(continued...)

2009, Shiner underwent an electroencephalogram(EEG)[29] which was conducted by Dr. Khan. Tr. 406 and 421. The results were normal. Id. On May 7 and July 8, 2009, Shiner was again examined by Dr. Khan. Tr. 413-416 and 482-484. The results of mental status and physical examinations were essentially the same as those reported by Dr. Khan on April 15, 2009, including Shiner had normal muscle tone and strength, a normal gait and station, and normal coordination. Id.

On July 24, 2009, Shiner underwent an MRI of the cervical spine which revealed an "[u]nchanged small right paracentral disc herniation/protrusion at C5-C6 resulting in mild right side spinal canal stenosis without impingement."[30] Tr. 513.

---

28. (...continued)
rest of the body at each level along the spine. The nerve roots exit through holes (foramen) in the bone of spine on the left and the right. Radiculopathy can be the result of a disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (Last accessed April 29, 2014).

29. An EEG is the main diagnostic test for epilepsy and may play a role in diagnosing other brain disorders. EEG (electroencephalogram) Mayo Clinic staff, http://www.mayoclinic.org/tests-procedures/eeg/basics/definition/PRC-20014093 (last accessed April 29, 2014).

30. The report of this MRI noted that the disc protrusion indented the thecal sac and appeared to focally touch the spinal cord without spinal cord impingement. Tr. 513. The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which merely impinge the thecal sac without contacting nerve tissue do not cause pain symptoms. See Thecal Sac Impingement, Cure-Back-Pain.Org, http://www.cure-back-pain.org/thecal-sac-impingement.html (Last
(continued...)

On August 27, 2009, Dr. Mauthe after conducting a physical examination of Shiner reported that Shiner had normal range of motion of the neck, normal strength, a negative Hoffman's test, and no signs of clonus (tremors or rapid muscular contractions) or upper motor neuron dysfunction. Tr. 504.

Less then a month after the appointment with Dr. Mauthe, Shiner was examined on September 14, 2009, by Chirag J. Kalola, M.D., at Good Shepherd Rehabilitation Hospital. Tr. 666-668. Dr. Kalola reported that Shiner had a mildly antalgic gait; difficulty walking on heels and toes because of issues with balance and self-reported weakness; tenderness of the paraspinal muscles; some limited lumbar range of motion; a mildly positive Hoffman's test; and impaired light touch sensation of a "patchy distribution" in the upper and lower extremities with no clear peripheral nerve or dermatomal distribution.[31] Tr. 667. Dr. Kalola noted that Shiner reported a myriad of symptoms and that some of Shiner's cognitive and linguistic complaints were suggestive of a mild traumatic brain injury despite his normal brain MRI. Tr. 668. Dr. Kalola referred Shiner to Deborah Kimmel, M.D., the medical director of Good Shepherd's brain

---

30. (...continued)
accessed April 30, 2014).

31. A dermatome is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatome. See Stephen Kishner, M.D., Dermatomes Anatomy, Medscape Reference, http://emedicine.medscape.com/article/1878388-overview (Last accessed April 29,2014).

injury and multiple sclerosis programs,[32] for neuropsychological testing. Tr. 785. Dr. Kimmel examined Shiner, as requested by Dr. Kalola, and advised that Shiner had already had neuropsychology testing completed, that testing was normal, and that there was no need for further treatment. Tr. 786.

On October 16, 2009, Shiner had an initial appointment with Ralf Van Der Sluis, M.D., a neurologist, at which Shiner complained of headaches, neck pain and low back pain all allegedly stemming from the December 14, 2008, motor vehicle accident. Tr. 515-519. Shiner told Dr. Van Der Sluis that he was smoking 3 packs of cigarettes per day and that he had been smoking for 30 year,s but not at the present level. Tr. 516. Dr. Van Der Sluis's physical and neurological examination findings of Shiner are somewhat different than prior examination findings but not significantly different. Tr. Tr. 517-518. Dr. Van Der Sluis reported that he observed cervical paraspinal muscle spasm and tenderness, as well as limited range of motion. Tr. 517. Dr. Van Der Sluis also reported thoracic and lumbosacral paraspinal muscle spasms; sacroiliac joint tenderness on the right greater than the left; pins and needles and pain with palpation of the sciatic notch on the right; a positive slump test causing pins

---

32. http://www.goodshepherdrehab.org/doctor/deborah-n-kimmel-md. (Last accessed April 29, 2014).

and needles down the right thigh;[33] a positive Adson test[34] causing pins and needles in the left hand; slightly reduced grip strength bilaterally; and allodynia, as well as hyperalgesia[35] to pinprick in the lateral aspect of the right foot. Id. Otherwise, the examination findings were normal, including Shiner had good recent and remote memory; he had normal muscle strength in the upper and lower extremities (other than as noted for the hands); he had a normal gait; he had normal coordination; his reflexes were essentially normal; he had a negative Hoffman's test bilaterally; and he was able to tandem walk without difficulty. Tr. 517-518.

On October 21, 2009, Shiner was evaluated by Michael Degilio, Psy.D., a psychologist, located in Lehighton, Pennsylvania. Tr. 796-800. Dr. Degilio reported that Shiner's appearance was neat; his thought process was coherent; his thought content involved loose associations but with no suicidal ideas; his interaction was superficial; his affect was appropriate, his mood was neutral and positive; and his behavior was spontaneous and purposeful. Tr. 797. Dr. Degilio also reported that Shiner's orientation, attention/concentration,

---

33.  A positive slump test can suggest a herniated disc or nerve tension.

34.  A positive Adson test suggests the patient may be suffering from thoracic outlet syndrome, a condition which impacts the nerves and blood vessels of the shoulders.

35.  Allodynia is pain resulting from a non-traumatic or non-noxious stimulus to the normal skin. See Dorland's Illustrated Medical Dictionary, 51 (32nd Ed. 2012). Hyperalgesia is an abnormally increased pain sense. Id. at 886.

comprehension, and motor activity were all grossly intact and that his insight and judgment were normal, but he had mildly impaired coping skills and a mildly impaired support network. Tr. 798. Dr. Degilio concluded that Shiner suffered from an adjustment disorder, not otherwise specified, and gave Shiner a Global Assessment of Functioning (GAF) score of 60, representing the borderline between moderate and mild symptomatology.[36] Id.

On October 23, 2009, Kimberly Ernst-Ganey, M.Ed., a psychologist, evaluated Shiner and gave Shiner a GAF score of 57, representing moderate symptomatology. Tr. 603-604. Shiner,

---

36. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

commencing on October 26, 2009, had counseling sessions with Ms. Ernst-Ganey which continued into 2010 with the primary objective of helping Shiner learn effective skills to cope with anxiety and depression. Tr. 590-609 and 846-850. Ms. Ganey's counseling records consist in large part of recording Shiner's subjective complaints. Id.

On November 3, 2009, Shiner had an appointment with Dr. Kalola regarding his diffuse pain complaints. Tr. 669. A physical examination revealed that Shiner had a normal, nonantalgic gait; Shiner was able to heel and toe walk; Shiner had full, normal cervical range of motion; and Shiner had normal, symmetric reflexes. Id. Dr. Kalola reported that Shiner's strength was difficult to assess because of "give-away weakness"[37] but that it was at least 4/5 to 4+/5 in the bilateral upper extremities.[38] Id. Shiner had decreased sensation in the right upper extremity but in a "patchy distribution." Id. Dr. Kalola noted that Shiner "has a trend of seeking care from various physicians at the same time and not completing the course of workup or treatment with any physician." Tr. 670. Dr. Kalola

---

37. "Give-away" weakness is where the patient exerts resistance briefly and then suddenly resistance collapses. This may result from several factors, including pain, poor effort or malingering.

38. "A 4/5 grade indicates that the muscle yields to maximum resistance. The muscle is able to contract and provide some resistance, but when your physical therapist presses on the body part, the muscle is unable to maintain contraction. . . A grade of 4+/5 indicates that your muscle yields to maximum resistance, but was able to provide some resistance during the testing." Muscle Strength Measurement, Physical Therapy, About.com, http://physicaltherapy.about.com/od/orthopedicsandpt/a/strengthme asurement.htm (Last accessed April 29, 2014).

indicated that he had nothing further to offer Shiner other that
to encourage him to continue in a course of rehabilitation
therapy. Id.

On November 11 and 30 and December 30, 2009, and
January 12, 2010, Shiner had appointments at the Northeast
Neurology Center, the practice with which Dr. Van Der Sluis was
associated. Tr. 808-818. The records of these appointments do not
report any substantial change in Shiner's condition from those
previously reported. Id.

On February 9, 2010, Shiner was evaluated by Uchenna C.
Uzoukwu, M.D., a psychiatrist, with Behavioral Health Associates,
Inc., located in Weissport, Pennsylvania. Tr. 857-858.  A mental
status examination revealed that Shiner appeared older than his
stated age; Shiner had good hygiene and grooming and was polite
and cooperative, with slight psychomotor retardation; Shiner's
speech was soft and low-toned and his mood was depressed and he
had a restricted affect; Shiner had no auditory or visual
hallucinations, no delusions, and no suicidal or homicidal
ideations; Shiner's thought process was normal and goal directed,
although Shiner was preoccupied with his multiple physical
complaints; Shiner was alert and oriented to time, place and
person; Shiner's concentration and attention was fair; Shiner had
intact long-term and short-term memory with no evidence of memory
impairment; and Shiner had limited insight. Tr. 858 The
diagnostic assessment was that Shiner suffered from major
depressive disorder and he was given a current GAF score of 45-

50, representing serious symptoms. Id. However, at an appointment
on February 23, 2010, Dr. Uzoukwu reported that Shiner's mood was
euthymic instead of depressed and did not record a GAF score. Tr.
856.  Shiner at the appointment on February 23, 2010, reported
that he was taking a computer class and denied any hopelessness
or helplessness. Id.  At an appointment with Dr. Uzoukwu on April
6, 2010, Shiner reported that he was doing well, that his mood
was good, and that he was attending school full-time. Tr. 855.
Dr. Uzoukwu noted that Shiner's mood was euthymic with an affect
broad in range but did not report a GAF score. Id.  Dr. Uzoukwu
made similar findings on May 3 and June 1, 2010. Tr. 853-854.

A claimant has the burden of proving that he or she was
unable to work. See 42 U.S.C. § 423(d)(5)(A); Heckler v.
Campbell, 461 U.S. 458, 460 (1983); 20 C.F.R. § 404.1512 (all
indicating that the burden is on a claimant to furnish relevant
evidence that he is disabled). Even though Shiner treated with
multiple medical providers, no physician, psychiatrist or
psychologist has provided a functional assessment of Shiner
indicating that he is or was unable to perform any type of work
for the requisite continuous 12-month statutory period.[39]  Also,
as stated earlier, the record contains an assessment from a state
agency psychologist, as well as a state agency physician, who

---

39.  To receive disability benefits, the plaintiff must
demonstrate an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment which can be expected to result in death or
which has lasted or can be expected to last for a continuous
period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

found based on their review of Shiner's medical records that
Shiner did not suffer from any severe impairments.  The ALJ,
although giving Shiner the benefit of the doubt, appropriately
relied on those opinions. Cf. See Chandler v. Commissioner of
Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that
the [state agency physician's] report was properly considered by
the ALJ, we readily conclude that the ALJ's decision was
supported by substantial evidence[.]").

As for Shiner's claim that the ALJ erred by finding
that he could perform the job of ticket taker because that
position involved the computation of change, the vocational
expert specifically indicated that the ticket taker position,
which he identified, did not require the computation of change.
Tr. 74.  Likewise, with respect to Shiner's argument that the
light assembler and information clerk positions would not
accommodate a sit/stand option, the vocational expert
specifically indicated there were such positions which permitted
an employee to sit and stand at will. Tr. 72 and 75.

To the extent that Shiner argues that the ALJ should
have found in his favor based on the testimony he presented at
the administrative hearing, the administrative law judge was not
required to accept Shiner's claims regarding his physical or
mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873
(3d Cir. 1983)(providing that credibility determinations as to a
claimant's testimony regarding the claimant's limitations are for
the administrative law judge to make).  It is well-established

31

that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Shiner testify, the administrative law judge is the one best suited to assess his credibility.

We are satisfied that the administrative law judge appropriately took into account all of Shiner's physical and mental limitations established by the medical records in setting Shiner's residual functional capacity. The administrative law judge concluded that Shiner could engage in a limited range of sedentary to light work. Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g,) affirm the decision of the Commissioner.

An appropriate order will be entered.